## STEWART *v.* THOMAS.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; PRIORITY.

1. Reduction to practice under a claim in interference reciting a lamp socket for electric signboards, adapted to be mounted and adjusted from the rear of the board, and "carrying within it lamp-receiving

terminals and having also wire terminals," may be accomplished with a model which contains no lamp or wire terminals, where the inventive feature consists of attachability and accessibility from the rear of the board, the terminals being old in the art.   (Citing *Gaisman* v. *Gillette,* 36 App. D. C. 440.)

2. Reduction to practice with a model which demonstrated the utility and practicability of the device is not negatived by the fact that a new model was subsequently made to reduce the cost of construction, the new device omitting none of the essential elements of the original. (Citing *Sydeman* v. *Thoma,* 32 App. D. C. 362.)

3. Priority will be awarded the party in interference, who conceived the invention and reduced it to practice before the other entered the field, and who has neither secreted nor abandoned it, since lack of diligence is not.chargeable against the party who was the first to conceive and the first to reduce the practice.   (Citing *Hubbard* v. *Berg,* 40 App. D. C. 577.)

No. 905.   Patent Appeal.   Submitted March 11, 1914.   Decided April 6, 1914.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.            *Affirmed.*

The COURT in the opinion stated the facts as follows:

Appeal from a decision of the Commissioner of Patents in an interference proceeding in which priority of invention was awarded the appellee, George B. Thomas.

The invention involves an electric lamp socket adapted for use on electric signboards, and of such a construction that it may be mounted and adjusted from the rear of the signboard, where the wiring is done.   The sockets of the prior art were so constructed that their securing means were partly adjusted from the front of the sign plate and partly from the back.   This construction often required two men to adjust the socket, whereas, under the construction of the issue, one man can do the work. The invention is set forth in one count, as follows:

"An electric-sign receptacle comprising an insulating body carrying within it lamp-receiving terminals and having also wire terminals, outwardly projecting claws carried by the receptacle

and adapted to be inserted through the sign plate from the rear
in any position rotarily, and means, in connection with said
claws, to grip said sign plate so as to hold the receptable against
rotation."

Mr. Thomas is a mechanical engineer of the Bryant Electric
Company, the owner of his invention. His duties consisted in
supervising inventions and models, instructing model makers,
and designing new models and electrical devices. About July
20, 1908, he made pad sketches of the invention in issue and,
on July 23d commenced a model which was completed on the
24th. The model card which was made at the time was intro-
duced in evidence, as was the model itself, which was marked
with his name and the date of its completion. The model card,
containing a sketch of the invention, was witnessed at the
time by Mr. F. E. Seeley and Mr. G. W. Goodridge, to whom
the invention was fully explained by Mr. Thomas. The model
contains an insulating body or receptacle, has outwardly project-
ing claws carried by the receptacle and adapted to be inserted
through the signboard from the rear, in any position rotarily, and
means in connection with the claws to grip the signboard and
hold the receptacle against rotation. In short, it fully embodies
every real element of the invention. Mr. Thomas, Mr. Seeley,
and Mr. Goodridge tested this device, and found that it did
what it was expected and required to do; namely, that it was
capable of being inserted from the rear of the plate and there
adjusted as called for by the issue. The tribunals of the Patent
Office refused to accept this model as a reduction to practice,
because it did not have within it lamp-receiving and wire
terminals. While those elements are mentioned in the issue,
they were both well known to the art, and really form no part
of the invention. Mr. Thomas explains that he did not stop
to put in the screw shell or lamp-receiving terminal and the
wire terminals, for the simple reason that in common practice
all such receptacles contained them. What he was endeavoring
to demonstrate, and what he did demonstrate, was that his de-
vice would overcome the limitations of prior devices. That
having been demonstrated, it was merely necessary for him to

attach the screw shell and wire terminals of the common and well-known type, as any mechanic with any knowledge of the art could have done.

*Mr. Victor D. Borst* and *Mr. William M. Stockbridge* for the appellant.

*Messrs. Howson & Howson* and *Mr. William Abbe* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

If the claim read "an insulating body *capable* of carrying within it a lamp-receiving terminal and capable of having attached wire terminals," it could not reasonably be contended that the failure of Thomas to install those old elements in his model would have precluded a finding that such model amounted to a reduction to practice. We think the claim should be thus construed. That this view is the correct one is apparent from subsequent developments.

When Mr. Goodridge, who was the general superintendent of the Bryant Company, examined and tested this model, he informed Mr. Thomas that "while his device was perfectly satisfactory from a mechanical point of view, in operation," it would be rather expensive to make, and he therefore advised Mr. Thomas, after he had finished other models which were then in the model room and for which there was a great rush, to devise some way to cheapen the construction. In October of 1909, Mr. Seeley, assistant general superintendent of the Bryant Company, suggested a modification of the device of Mr. Thomas, and he and Mr. Thomas thereupon jointly made out another model card, and had made another model embodying the simplified construction. This model contains the screw shell and wire terminals, but the evidence does not show that a lamp and wires were actually attached to it. The Examiners in Chief and the Commissioner, however, accepted it as a reduction to practice. In their opinion the Examiners in Chief said: "The

invention might well be regarded as one which, as disclosed in this exhibit, would require no test to determine its practicability, but it is not necessary to so consider it, as we are of the opinion that all that would be required as a test for such a device would be to clamp it in position and see that it would be properly held therein. It is not necessary to attach a lamp and wires and operate the lamp, for these features form no part of the invention, although included in the issue, and as the device did not differ in those particulars from the lamp sockets in use, their successful operation was a foregone conclusion."

Because the modified device, therefore, contained the screw thread and wire terminals, the Examiners in Chief and the Commissioner were satisfied to accept it as a reduction to practice, even though the evidence did not show that a lamp and wires had been attached and the lamp operated. Their reason for this ruling was that the screw thread and wire terminals were old and their mode of operation certain. While we are fully satisfied with this reasoning, we think it logically follows that the first device of Thomas amounted to a reduction to practice; for, had he attached thereto those old elements in the old way, as was done in the second device, it would have been unnecessary for him to have demonstrated their operation. The new device differed from the old merely in the manner in which it was adjusted to the plate. In all other respects it was the same. To rule that the failure of Thomas to attach those old elements to his first device, when they formed no part of his invention and would not have aided in the slightest degree in demonstrating its practicability, would be a splitting of hairs unworthy of a court of justice. When Thomas finished and tested this model his invention was complete. The problem confronting him was solved. *Gaisman* v. *Gillette,* 36 App. D. C. 440. The fact that a more desirable commercial result was subsequently obtained is of no consequence, because the first result demonstrated the utility and practicability of the device. *The Corn-planter Patent,* 23 Wall. 181, 23 L. ed. 161; *Sydeman* v. *Thoma,* 32 App. D. C. 362, 373.

Since Mr. Stewart did not enter the field until January, 1909,

a time subsequent to the conception and reduction to practice of Thomas, and as the invention was neither secreted nor abandoned by Mr. Thomas, it is apparent that Mr. Thomas must prevail, as lack of diligence is not chargeable against one of the parties in an interference where he was the first to conceive and the first to reduce to practice. *Hubbard* v. *Berg,* 40 App. D. C. 577.

Decision affirmed.                                    *Affirmed.*

On April 28, 1914, a motion for a rehearing was denied.

Mr. Justice ANDERSON sitting for Mr. Chief Justice SHEPARD.